Louis W. VALBERT,
Plaintiff–Appellant,

v.

Dr. James H. PASS,
Defendant–Appellee.

No. 88–1461.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1988.
Decided Jan. 19, 1989.

Kathryn A. Spalding, Hinshaw Culbertson Moelmann Hoban & Fuller, Chicago, Ill., for defendant-appellee.

Mitchell K. Shick, Harlan Heller Ltd., Mattoon, Ill., for plaintiff-appellant.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Louis W. Valbert filed this medical malpractice suit against Dr. James H. Pass, seeking $500,000 in damages for injuries suffered as the result of the amputation of his right lower leg. The jurisdiction of the district court was based on diversity of citizenship under 28 U.S.C. § 1332. Dr. Pass requested a jury trial, and the jury returned a verdict in his favor. The district court denied Mr. Valbert's motion for a new trial. We affirm the judgment of the district court.

I

Background

Mr. Valbert is an eighty-two-year-old retired resident of Jasper County, Illinois.

At approximately 2:30 a.m. on June 26, 1984, Mr. Valbert experienced a sharp pain above his right knee that felt as though someone had hit him with a hammer. He had never experienced such a problem before. Mr. Valbert was in pain throughout the morning and was unable to put pressure on his right leg and foot.

At 7:30 a.m. on the morning of the 26th, Mr. Valbert was taken to Richland Memorial Hospital in Olney, Illinois. He was initially examined by Dr. Murray, his family physician, and then referred to Dr. Pass. Dr. Pass was a specialist in general surgery, but he was practicing vascular surgery at Richland because no vascular surgeon was then affiliated with that hospital. Dr. Pass preliminarily diagnosed Mr. Valbert as suffering from obliterative arterial disease with partial occlusion. Dr. Pass ordered the performance of several tests and began treating Mr. Valbert with heparin, an anticoagulant used to prevent further vascular blockage.

A Doppler study [1] revealed that the blood pressure in Mr. Valbert's right leg was lower than normal. The doctor who prepared the results of the study, Dr. Bouffard, recommended that "selected angiograms" be performed "if clinically indicated." An angiogram (also referred to as an arteriogram) [2] was suggested because of the possibility of a complete arterial occlusion. Based upon his examination of Mr. Valbert, Dr. Pass concluded that an arteriogram was not indicated at that time. Dr. Pass also decided not to perform an arteriogram after reviewing the results of a second Doppler study ordered on July 2, 1987. The test results were inconsistent with Dr. Pass' physical examinations of his patient.[3] Dr. Pass did not request that another Doppler study be performed.

---

1. A Doppler study is a diagnostic tool utilizing ultrasound that is used to determine the blood pressure in certain areas of the body, including the leg. The blood pressures that are registered provide an indication of the blood flow in the leg. *See* Tr. at 136–37, 184–85.

2. An arteriogram is a technique used to visualize the flow of blood in an artery. Dye is

injected into the appropriate blood vessels and then a series of x-rays are taken to record the flow of the dye. *See* Tr. at 191, 516.

3. The Doppler study taken on July 2 stated that the blood pressure at several points in Mr. Valbert's leg was zero. The blood pressure at several other points was not recorded. A recording of zero indicates that no blood is flowing into

On July 15, 1984, Mr. Valbert was discharged from Richland and transferred to Good Samaritan Hospital in Vincennes, Indiana. Upon his arrival at Good Samaritan, he was treated by Dr. Tuttle. His initial diagnosis was that Mr. Valbert suffered from arteriosclerosis with an occlusion of the interpopliteal artery, and he began treatment by prescribing Vasolidan, a vascular dialator. Two days after his admission to Good Samaritan, Mr. Valbert underwent an arteriogram. The test revealed an aneurysm of the right proximal popliteal artery. This discovery was not anticipated by Dr. Tuttle on the basis of his physical examination of Mr. Valbert. *See* Tr. at 287.

Dr. Tuttle then performed an arterial bypass operation. The aneurysm was removed and replaced with a synthetic graft. Dr. Tuttle, however, was unable to remove all the clotted material in the artery. There were no major complications immediately after surgery. By early the next morning, however, Mr. Valbert's foot was white. He also began requesting pain medication for his right leg. Four days after the operation, Mr. Valbert developed a pre-gangrenous condition in his foot. Further reconstructive surgery was not possible because there were no open vessels in Mr. Valbert's foot. Therefore, Mr. Valbert's leg was amputated below the knee.

Mr. Valbert filed this action on June 17, 1987. He asserted that the amputation of his leg was the proximate result of Dr. Pass' allegedly negligent failure to provide him with proper treatment. Judgment was entered on the jury's verdict in favor of Dr. Pass. The district court denied Mr. Valbert's motion for a new trial, and this appeal followed.

the area. Under such circumstances, Mr. Valbert's foot would have been cold and white. However, Dr. Pass' clinical examination of Mr. Valbert on July 2 indicated that he had adequate circulation to his foot. *See* Tr. at 650, 704.

4. Federal law controls our review of the district court's grant or denial of a motion for a new trial in a diversity action. *Davis v. FMC Corp.,* 771 F.2d 224, 232 (7th Cir.1985).

II

Discussion

Mr. Valbert advances two arguments in support of his contention that the district court abused its discretion in denying his motion for a new trial. First, he maintains that the jury's verdict was against the manifest weight of the evidence. Second, he asserts that the jury was unfairly influenced and misled by several remarks made by Dr. Pass' counsel during her closing argument.

Our review of a district court's denial of a motion for a new trial is "narrowly circumscribed." *Durant v. Surety Homes Corp.,* 582 F.2d 1081, 1088 (7th Cir.1978).[4] The district court, having seen the presentation of the evidence and observed the course of the trial, is in a unique position to rule on a new trial motion.[5] For this reason, "the trial court has great discretion in determining whether to grant a new trial." *Forrester v. White,* 846 F.2d 29, 31 (7th Cir.1988). Thus, our review on appeal is limited to considering whether the district court abused its discretion by denying the new trial motion. *See Christmas v. Sanders,* 759 F.2d 1284, 1289 (7th Cir. 1985); *Spesco, Inc. v. General Elec. Co.,* 719 F.2d 233, 240 (7th Cir.1983).

In disposing of a motion for a new trial, the district court must decide if the verdict is against the weight of the evidence, or if the trial was unfair to the moving party for some other reason. *Forrester,* 846 F.2d at 31. The court's decision "will be reversed only when exceptional circumstances show a clear abuse of discretion." *Sellers v. Baisier,* 792 F.2d 690, 693 (7th Cir.1986). " '[I]f reasonable men could differ as to the propriety of the [district] court's action, no abuse of discretion has been shown.' " *Davlan v. Otis Elevator*

5. *See Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983) (appellate review of a district court's refusal to set aside a jury verdict "is extremely limited because of [that court's] superior ability, by virtue of having observed the jury at first hand, to assess its fairness and competence").

*Co.*, 816 F.2d 287, 289 (7th Cir.1987) (quoting *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir. 1980)). In addition, we accord "great deference" to a district court's denial of a new trial motion. *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 721 (7th Cir.1987). Moreover, "[r]eluctance to second-guess the trial court's decision on a motion for retrial should be especially strong with respect to decisions based on the trial court's assessment of the weight of the evidence." *Id.* In light of these principles, we cannot say that the district court abused its discretion in this case by denying Mr. Valbert's motion for a new trial.

■ Mr. Valbert first asserts that the jury's verdict was against the manifest weight of the evidence. He notes that there was testimony from medical experts showing that Dr. Pass deviated from the proper standard of care by failing to perform an arteriogram and by failing to refer Mr. Valbert to a vascular surgeon early on in his treatment. Mr. Valbert also contends that the evidence strongly indicates that Dr. Pass' failure to meet the appropriate standard of care resulted in the amputation of Mr. Valbert's leg. However, our review of the testimony presented at trial shows that the testimony was conflicting both as to deviation from the standard of care and causation.

For example, Mr. Valbert's expert, Dr. McAffee, testified that Dr. Pass deviated from the required standard of care as a surgeon while treating Mr. Valbert in that he failed to obtain an arteriogram and failed immediately to refer Mr. Valbert to a facility equipped to handle vascular surgical problems. *See* Tr. at 470–71. Dr. Tuttle, the physician who treated Mr. Valbert at Good Samaritan Hospital, also testified that Dr. Pass' failure to obtain an arteriogram constituted a deviation from the appropriate standard of care. Tr. at 308. However, at another point in his testimony, Dr. Tuttle stated that he had no criticism of Dr. Pass' failure to perform an arteriogram, and he acknowledged that treatment of Mr. Valbert with heparin ther-

apy "probably" was an appropriate method of treatment meeting acceptable standards of care. Tr. at 303–04. In addition, Dr. Pass' expert, Dr. Dillard, testified that Dr. Pass' decision not to utilize arteriograms did not deviate from accepted medical standards. Tr. at 517–18. He also testified that the use of heparin by Dr. Pass was an appropriate treatment meeting accepted medical standards.

The experts' testimony with regard to causation is similarly conflicting. Dr. McAffee stated that, if surgery had been performed on the day Mr. Valbert had first been admitted to the hospital, his foot "probably would have been saved." Tr. at 460. He also conceded, however, that the failure of the synthetic graft used by Dr. Tuttle could itself have caused Mr. Valbert to lose his foot. Tr. at 427. Dr. Dillard also testified that some occurrence in the wake of Mr. Valbert's popliteal aneurysm bypass surgery could have necessitated the amputation of Mr. Valbert's lower leg and foot. *See* Tr. at 529–30. For example, blood clots could have developed on the suture line and interrupted the flow of blood to the foot. *See* Tr. at 530.

In addition, neither Dr. McAffee nor Dr. Tuttle could rule out the possibility that Mr. Valbert would have lost his leg even if surgery had been performed earlier during Mr. Valbert's treatment. *See* Tr. at 441–42, 302, 309, 314. Dr. Tuttle testified that, if the period of time between the experience of pain and initial treatment is greater than six hours, then the damage caused by an acute vascular insufficiency very often is irreparable. Tr. at 309, 318–19. In this case, Mr. Valbert first experienced pain at 2:30 a.m. but was not presented to Dr. Pass until 1:10 p.m.—a period of more than ten hours. Tr. at 613. Finally, Dr. Dillard testified that smoking is "very deleterious" to patients suffering from vascular insufficiencies and that the amputation rate is three or four times greater after vascular surgery in a patient who smokes than in one who does not smoke. Tr. at 503–04. Although Mr. Valbert quit smoking when Dr. Tuttle refused to operate if he did not do so, he is currently a smoker, has been smoking for more than seventy years, and

was a smoker during his hospitalization. Tr. at 126.

Given the presence of this conflicting testimony in the record, it was not unreasonable for the district court to conclude that the jury's verdict in this case was not against the manifest weight of the evidence. *See* R. 40. It was the jury's task to determine the credibility of the witnesses. *Christmas*, 759 F.2d at 1289. The jury here weighed the conflicting evidence and resolved the conflict in favor of Dr. Pass. Such a result is not the sort of "exceptional circumstance[ ]" requiring the reversal of a district court's denial of a motion for a new trial. *Sellers*, 792 F.2d at 693.

The district court also did not abuse its discretion in refusing to accept Mr. Valbert's contention that several comments made by Dr. Pass' counsel during her closing argument constituted grounds for a new trial. Mr. Valbert points to three instances of allegedly improper conduct during defense counsel's closing argument that he maintains prejudiced the jury against him. First, he argues that defense counsel was asserting facts not in the record when she stated that "Dr. Pass had no conversations with Dr. Tuttle" and said that Mr. Valbert had given his own case history to Dr. Tuttle. *See* Tr. at 794–95.[6] Second, Mr. Valbert objected to defense counsel's assertion that Dr. McAffee, plaintiff's expert, earned $4000 in one month "testifying in medical malpractice cases against doctors rather than practicing medicine." *See* Tr. at 805. Finally, Mr. Valbert contends that defense counsel attempted to appeal to the passion and prejudice of the jury when she described his evidence regarding Dr. Pass as "malicious" and alleged that, even if Dr. Pass had performed surgery early on in his treatment of Mr. Valbert, Mr. Valbert "would have lost his leg anyway, and we would be right back in this courtroom today." *See*

Tr. at 810, 813. In denying Mr. Valbert's new trial motion, the district court noted that defense counsel's remarks "were neither erroneous nor prejudicial." *See* R. 40. We agree.

■ This court has repeatedly explained that "improper comments during closing argument rarely rise to the level of reversible error." *Probus v. K–Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir.1986); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1311 (7th Cir.1985). This observation is particularly pertinent when the comment is merely a brief and unrepeated part of a lengthy argument. *Probus*, 794 F.2d at 1211; *Ramsey*, 772 F.2d at 1311. In addition, an instruction to the jury stating that the arguments of counsel are not evidence can mitigate the harm potentially caused by improper statements made by counsel during closing argument. *See Probus*, 794 F.2d at 1211; *cf. Ramsey*, 772 F.2d at 1311; *Lenard v. Argento*, 699 F.2d 874, 897 (7th Cir.) (improper statements of counsel, made "in the context of all the evidence and the clear cautionary instructions of the trial court regarding the arguments of counsel, ... do not rise to the level of reversible error"), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983).

■ Defense counsel's remarks in this case were not so prejudicial that the district court's denial of Mr. Valbert's new trial motion constitutes reversible error. There appears to be nothing improper about either of the first two comments relied upon by Mr. Valbert. Dr. Tuttle's testimony does not state that he had any direct conversation with Dr. Pass. The testimony permits the inference that Dr. Tuttle's knowledge of the referring physician's assessment of his patient's condition came from information given to Dr. Tuttle by Mr. Valbert at the time his case history

---

**6.** Defense counsel made this argument in order to rebut an assertion made by Mr. Valbert's counsel during his closing argument. Plaintiff's counsel asserted that, when Dr. Pass referred Mr. Valbert to Dr. Tuttle, Dr. Pass "told" Dr. Tuttle that Mr. Valbert's "condition was getting worse." *See* Tr. at 776. Plaintiff's counsel apparently based this assertion on testimony given

by Dr. Tuttle. When asked what history he obtained concerning Mr. Valbert at the time of Mr. Valbert's referral to him, Dr. Tuttle testified that it "appeared that, according to the referring physician, that the foot was getting worse, instead of better, at the time, at least at the time he referred him over." *See* Tr. at 275–76.

was taken. Since counsel is entitled to make arguments based on reasonable inferences from the evidence during closing argument,[7] there was nothing improper in Dr. Pass' counsel stating that Dr. Pass had not had any conversation with Dr. Tuttle or suggesting that Mr. Valbert had given his own case history to Dr. Tuttle.

■ Similarly, there was nothing prejudicial in defense counsel's statement regarding Dr. McAffee's earnings from testifying against doctors in malpractice cases. While considering Mr. Valbert's objection to this statement, the district court noted that "Dr. McAffee did state in his deposition that the bulk of his income is derived from testifying for plaintiffs and against doctors in medical malpractice cases." Tr. at 805. The court concluded that, since the deposition had been read to the jury, the jurors should be allowed to "make up their mind[s] about" the statement. Tr. at 806. Because this statement had a reasonable basis in the evidence presented during the trial, it does not rise to the level of reversible error.

■ Finally, defense counsel's assertion that Mr. Valbert would have lost his leg and sued Dr. Pass even if surgery had been performed immediately upon his admission to Richland Memorial Hospital is not so prejudicial as to require a new trial. This comment was merely a brief part of defense counsel's argument. In addition, the jury was given a cautionary instruction with regard to arguments of counsel. They were told that arguments of counsel were not evidence, and they were instructed to disregard any argument having no basis in the evidence. *See* R. 31. Therefore, even if this isolated and unrepeated comment was improper, it does not rise to the level of a reversible error supporting a motion for a new trial.

### Conclusion

The judgment of the district court is affirmed. The verdict of the jury was not against the manifest weight of the evidence, and the allegedly improper comments made by defense counsel in her closing argument do not constitute reversible error. The district court did not abuse its discretion in denying Mr. Valbert's motion for a new trial.

AFFIRMED.

---

**7.** *See Durant v. Surety Homes Corp.,* 582 F.2d 1081, 1089 (7th Cir.1978) ("suggesting inferences to a jury in final argument without misstating the supporting evidence is perfectly proper").

Mr. Valbert's contention that these comments were so improper as to require a new trial must also be rejected because no objection to the comments was made at trial. *See Deppe v. Tripp,* 863 F.2d 1356, 1364 (7th Cir.1988).