**Susanne LITTLEFIELD, Plaintiff,**

v.

**Wally MACK, Santa Maria Realty and Malcolm McGuffey, Defendants.**

No. 88 C 9803.

United States District Court,
N.D. Illinois, E.D.

Nov. 16, 1990.

---

Aram A. Hartunian, Steven P. Schneck, Hartunian, Futterman & Howard, Chtd., Chicago, Ill., for plaintiff.

Richard H. Hoffman, Querrey & Harrow, Ltd., John T. Harris, James T. Elsesser & Associates, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

Susanne Littlefield, who is white, sued Malcolm McGuffey for refusing to rent an apartment to her and for harassing and intimidating her because she has a black boyfriend. She sued for violation of the civil rights laws and the Fair Housing Act under 42 U.S.C. §§ 1982, 3604, 3613, and 3617 and for intentional infliction of emotional distress under Illinois common law. A jury found for Ms. Littlefield and awarded her $50,000 in compensatory damages

and $100,000 in punitive damages. Mr. McGuffey now moves for judgment notwithstanding the verdict or a new trial. Ms. Littlefield asks for attorneys' fees under 42 U.S.C. §§ 1988 and 3613(c)(2). The court denies Mr. McGuffey's motions. The court grants attorneys' fees in full, but without a multiplier. The court assesses Rule 11 sanctions against Mr. McGuffey's attorneys.

### Facts

On September 14, 1988, Ms. Littlefield met with Mr. McGuffey at one of his apartment buildings, viewed an apartment, filled out a rental application, and gave him one month's rent ($280) as a security deposit. Ms. Littlefield and Mr. McGuffey agreed that the apartment would be occupied by Ms. Littlefield, her daughter Shaunte, and her sister Sandra. They also agreed that Mr. McGuffey would provide and install a carpet and that Ms. Littlefield would pay for the installation. Mr. McGuffey gave Ms. Littlefield a key to the apartment at this September 14 meeting. Between September 14 and 27, Ms. Littlefield and several friends and family members moved various belongings into the apartment, and cleaned and painted it.

On September 27, Ms. Littlefield's boyfriend, Bruce Collins, who is black, accompanied by Shaunte, took a check to Mr. McGuffey to pay for the carpet installation. After Mr. McGuffey was told of Mr. Collins' and Shaunte's relationship to Ms. Littlefield, he became very agitated and told Mr. Collins that "the old man" had rented the apartment to someone else. Mr. McGuffey called Ms. Littlefield at work to tell her she could not rent the apartment, that he had changed the locks, and that her belongings had already been removed from the apartment and placed on the porch.

Later that night, Mr. McGuffey called Ms. Littlefield at home, identified himself as Wally Luther, and, mimicking the voice of a black man, told her he wanted to move in with her and six other black guys, quit work, take welfare, share drugs, and swap wives. Mr. McGuffey called Ms. Littlefield at least twice that night and several times the following week. He also called Kathleen Gutierrez, Ms. Littlefield's sister, and asked her how Ms. Littlefield "could have [gone] to bed with a nigger and how she could ... have a nigger baby." When Ms. Gutierrez hung up, Mr. McGuffey called back at least four times that night, repeating the same insults about Ms. Littlefield in the same racist language. The following night, Mr. McGuffey again called Ms. Gutierrez with the same diatribe, but also told her that he was a member of the Ku Klux Klan. Mr. McGuffey continued to harass Ms. Gutierrez for at least a week with similar phone calls. A few days after Ms. Littlefield was evicted, Mr. McGuffey went to Ms. Gutierrez's house and tried to lure her outside on the pretext of having her move her car from a church parking lot that needed caulking. About a month later, in early November, 1988, Mr. McGuffey left a note pinned to Ms. Littlefield's door which read: "By the time you read this message kiss your nigger friend goodbye bitch—he's dead!!!"

All of the above facts were testified to by Ms. Littlefield and her witnesses, which included Kathleen Gutierrez, Richard Gutierrez (brother-in-law), Kenneth Gutierrez (brother-in-law), Sandra Littlefield, Bruce Collins, Lynette Pellegrini (friend), and Debbie Koontz (co-worker). Mr. McGuffey does not suggest in his motions that any of these witnesses lacked credibility.

Mr. McGuffey's version of the events is quite different. He denies that race played any part in his rejection of Ms. Littlefield as a tenant, and he of course denies all of the harassing phone calls and the death threat. He claims that he conducted an investigation of Ms. Littlefield and Mr. Collins between September 14 and September 27, 1988, and that what he uncovered about their rental and credit history convinced him not to rent to her. One problem with Mr. McGuffey's story is that not a single witness testified to support his claim that any of this damaging information was uncovered before the September 27 rejection. Another problem with Mr. McGuffey's story is that there was very little evidence that this supposedly damaging information was even true. For example, Ms. Little-

field put on witnesses who worked in the credit departments of the various companies where Mr. McGuffey claimed to have learned of Ms. Littlefield's poor credit. Their testimony was largely that this information would not have been given out, and that Ms. Littlefield's credit history was respectable. Ms. Littlefield also put on her former landlord, Brice Fawcett, from whom Mr. McGuffey had claimed to learn of twenty-four hour parties, vandalism, a broken door, and all manner of tenant evils. Mr. Brice not only contradicted everything that Mr. McGuffey claims to have been told (in fact, Mr. Brice considered Ms. Littlefield to be a good tenant), Mr. Brice also testified that Mr. McGuffey did not come to interview him until October 1, 1988. Mr. McGuffey's story therefore depended almost entirely on his own credibility, and he was, to put it mildly, a witness with credibility problems.

Here Mr. McGuffey testifies concerning his own identity:

[Mr. Schneck]:

Q  So the writing here where it says Santa Maria Realty, that's your writing?

[Mr. McGuffey]:

A  Yeah, I—yeah, I made that out, yeah. We do that stuff.

Q  Was the check actually made payable to Santa Maria Realty, or did you just fill that in?

A  I think I filled it in.  I don't know.

Q  I'm sorry.  I can't hear you.

A  I think it was close to Columbus Day, and I had Santa Maria Realty on my mind, so I made that out.

Q  You wrote it in?

A  Yeah.

Q  And endorsed it?

A  Yeah.

Q  Was there a Santa Maria Realty located in September of 1988?

A  No.

Q  Do you own Santa Maria Realty?

A  I made it up.

Q  Santa Maria Realty had no office?

A  Nothing, nothing.

Q  No employees?

A  Nothing.

Q  No checking account?

A  Uhn-un.  Nothing.

Q  Mr. McGuffey, whose handwriting is it where it says Osvaldo Kennardo?

A  That could be mine or Osvaldo Kennardo.

Q  You could have written Osvaldo Kennardo?

A  Yeah.

Q  Are you Osvaldo Kennardo?

A  I can be if I want to be, can't I?

Q  Are you?

A  If I want to be I can be, can't I?

Q  Have you gone by the name Osvaldo Kennardo?  ... Do you go by the name Osvaldo Kennardo?

A  Occasionally, yeah.

Q  Have you ever used the name Wally Mack?

A  Yeah.

Q  Mr. McGuffey, have you ever used the name Wally Luther?

A  No.  I've heard people call me that, though.

Q  You've never used the name Wally Luther?

A  No.  People can call anybody anything they want, I guess, can't they?

.    .    .    .    .

Q  And you just made up that name Santa Maria Realty?

A  I liked it.  I really did.  It was Columbus Day, and I always liked the Santa Maria, and I thought that's a great name for a real estate company.

Q  Had you ever used the name Santa Maria Realty before?

A  I don't think so.

Q  And you just made it up?

A  Right.

.    .    .    .    .

[One week later in the trial]

Q  This check that you accepted from Miss Littlefield, you gave this to Osvaldo Kennardo to pay him for expenses that you owed him; isn't that correct?

A  It's possible....

Q  Well, at your deposition were you asked the following question and did you give the following answer?

"Question: Then approximately four or five days later you gave this check to Osvaldo Kennardo; you endorsed this check and gave it to Osvaldo Kennardo in partial payment of work he did; is that your testimony?

"Answer: Yes."....

Q  Did you give that answer to that question?

A  Possible.  Possible.  Sounds good.  I don't remember.

Q  You don't remember?

A  It's two years ago.

Q  Would it refresh your recollection if I showed you the deposition transcript?

A  You got it in black and white there?

Q  I sure do.

A  Gee, let's see it.

(Document tendered to the witness.)

Q  It begins on the bottom line of this page.

A  Okay.  What was the question now?

.    .    .    .    .

Q  Did you give that answer to that question?

A  Sounds good to me, sir.  Sounds good to me, sir.

Q  What do you mean by "sounds good to me"?  Did you give the answer or not?

A  Sounds good to me.  I don't remember it.

Q  Did you give the answer or not?

A  Too long ago, sir.  I don't remember that stuff.

.    .    .    .    .

Q  Did Osvaldo Kennardo check on Miss Littlefield's application for you?

A  I had to process about eight applications.

Q  Yes or no?  Did Osvaldo Kennardo check on Miss Littlefield's application?

A  Might have.

Q  Does Osvaldo Kennardo regularly check on prospective tenants' applications for you?

A  Regularly?  What do you mean, like he's on the payroll or something?

Q  As part of your procedure for checking applications, does Osvaldo Kennardo check with tenants' employers for you?

A  If he happens to be riding by someplace, I'll ask him to stop by and check something out for me.  That's about it.

Q  So this person Osvaldo Kennardo who happens to ride by and you ask him to check on applications for you, didn't you testify that Osvaldo Kennardo is you?

A  Did I?

Q  Isn't Osvaldo Kennardo the same person as you?

MR. HOFFMAN:  Your Honor, I'm going to make an objection to this line of questioning.

THE COURT:  Overruled.

Q  Aren't you and Osvaldo Kennardo the same person?

A  I don't remember telling you that, sir.

Q  Do you recall testifying at this trial one week ago—

A  No.

Q  —that Osvaldo Kennardo and you are the same person?

A  I did?

Q  Page 11.  Did you give the following answers to the following questions at your trial testimony last Tuesday?

A  Um-hum.

Q:  (Reading:)

"Question:  Are you Osvaldo Kennardo?

"Answer:  I can be if I want to be, can't I?

"Question:  Are you?

"Answer:  If I want to be I can be, can't I?"....

Q  Did you give those answers to those questions at your trial testimony?

A  Sounds like—sounds like it.

Trial Transcript at 39–42;  46–47;  814–818.

Here Mr. McGuffey discusses the discrepancy between his deposition testimony—where he states that he had never heard of Bruce Collins before rejecting Ms. Littlefield as a tenant—and his story at trial that his pre-September 27 investigation uncovered information about Mr. Col-

lins that caused him to reject Ms. Littlefield.

BY MR. SCHNECK:

Q  At your deposition were you asked the following question and did you give the following answer?  Page 240.

"Question: Now, did you see any friends or relatives of Miss Littlefield prior to that Department of Housing—

"Answer: 241. "A man came over to the house.  It was early in the afternoon—it was in early afternoon.  We were working in the apartment.  He walked through the door because the door was open, standing open for air, and looked around.  Looks good, likes it, uh-huh. "I said, 'Who are you, sir?'  He said, "I'm Bruce Collins."  I said, 'Really? Who are you, sir?'  He said, "I am Susanne Littlefield's husband."  I said, "Oh,' and, well, I had never seen him.  I said "I never seen him before never heard anything about you.' "

Were you asked that question and did you give that answer at your deposition?

A  I believe so.  It sounds good.

Q  Page 246.  At your deposition were you asked these questions and did you give these answers:

"Question: Was that the first day you had ever seen Mr. Collins?

"Answer: First day I ever seen or heard of him."

Did you give that answer to that question?

A  Sounds good to me.

Q  Page 257.  Did you give the following answer to the following question at your deposition:

"Question: Now, is your testimony still the first time you ever heard or saw Mr. Collins was September 27 when he came over to your apartment?

"Answer: Yes, sir."

Q  Did you give that answer to that question?

A  I guess so.

.    .    .    .    .

Q  At your deposition did you give the following answers to the following questions:

"Question: The first time you told Miss Littlefield she wasn't going to get the apartment, was that in person or over the phone?

"Answer: Over the phone, I guess.

"Question: And that was a day or two prior to the Bruce Collins incident?

"Answer: Yes."

Did you give those answers to those questions?

A  I believe so.

Q  Just to sum this all up, on September 27th you first saw Bruce Collins and you never heard a thing about him before then, right?

MR. HOFFMAN: Objection, Your Honor.

THE COURT:  Grounds?

MR. HOFFMAN: Objection.  That's not his testimony.  He said earlier in his testimony he had heard about Collins before this.

THE COURT:  Overruled.

BY MR. SCHNECK:

Q  Just to sum up, on September 27th you first saw Bruce Collins and you never heard a thing about him before that, right?

A  Point.  Point.  How could I never hear a word about him?

Q  Had you ever heard a thing about him at that point?

A  When I was checking out his application, his name was on everything.  And his name was on the mailbox there too, wasn't it?

Q  So is your testimony from the deposition that you never heard about him or never saw him and never knew nothing about him, is that false?

A  No.

MR. HOFFMAN: Objection to that, Your Honor.

THE COURT:  Overruled.

BY MR. SCHNECK:

Q  No?

A  No.  I'd never seen him before.

Q  Never heard anything about him?

A  I must have heard something about him.  I think so.  What did I say in the deposition?

Q  Five times, I believe, at your deposition you said you never heard a thing about Mr. Collins by September 27.

A  Okay.

Q  Was that correct?

MR. HOFFMAN: Objection to that form of that question, Your Honor.

THE COURT: Overruled.

BY MR. SCHNECK:

Q  Was that correct?

A  If that's what I said, that's it then, yeah.

Q  So by September 27th you knew nothing about Bruce Collins, never heard anything about him and didn't know he existed; is that correct?

A  I guess so.

Q  And you rejected Susanne Littlefield as a tenant before that date, right?

A  Yes.

Q  You called her on the phone?

A  For the reasons I gave, yeah.

Q  And you told her, before you ever knew a thing about Bruce Collins you told her that you rejected her as a tenant, right?

A  That's what it says.

Q  So by the time you rejected her your reasons for rejecting her had nothing whatsoever to do with Bruce Collins, correct?

A  Correct.

Trial Transcript at 89–90; 93–95.

Here Mr. McGuffey testifies to his memory of what most people would consider significant—and difficult to forget—facts:

BY MR. SCHNECK:

Q  As you sit here today do you recall your date of birth?

A  I'll work on it for you if you want me to.

Q  You don't recall it today?

A  Not right now, no.

Q  Do you recall the names of either of your two prior wives as you sit here today?

A  No, sir, I don't.

Q  You did have two prior wives; is that correct?

A  Yes.

Q  You don't remember the name of your first wife?

A  I don't remember it now, no.

Q  No?

A  No.

Q  Or the name of your second wife?

A  No.

Q  You have three children; is that correct?

A  I think so, yeah.

Q  You think so?

A  Um-hum.

Q  Do you have three children?  Yes or no?

A  I think so, yes.

Q  Yes or no?

A  Yeah.

Q  Do you recall the names of your children?

A  No.

Trial Transcript at 106–108.

It is worth noting that these examples of Mr. McGuffey's prevarications depend not a whit upon the credibility of Ms. Littlefield or any of her witnesses.  The jury could assess Mr. McGuffey's lack of credibility entirely from his own words.  His testimony in these passages paints the portrait of a man who creates new identities for himself (both personal and corporate) at will; who heedlessly contradicts his sworn deposition testimony at trial, contradicts the contradiction, and then contradicts *that*; and who can't (or pretends he can't) remember his birthdate, the names of his two former wives, and his children's names.  Little wonder that the jury chose to disbelieve his claim that tenants "Joe" and "Mary" at one of Ms. Littlefield's former apartments told tales of parties and of out-of-state cars coming and going.  Little wonder that no credit was given to Mr. McGuffey's claim that he relied upon dirt dug up by one "Eddie Romero," an investigator who Mr. McGuffey did not call to testify, and who is no doubt a boon companion to Osvaldo Kennardo, occupying the

same niche in Mr. McGuffey's pantheon of personalities.

### Motion for Judgment Notwithstanding the Verdict

██ When ruling on a motion for a judgment notwithstanding the verdict, the court looks at the evidence, together with all reasonable inferences drawn from it, in a light most favorable to the non-moving party. If the evidence as a whole supports the verdict, the motion for a JNOV must be denied. *Cygnar v. City of Chicago,* 865 F.2d 827, 834 (7th Cir.1989). The court may not itself weigh the evidence or resolve conflicts in testimony. That is the function of the jury. *Id.* and *Fleming v. County of Kane,* 898 F.2d 553, 559 (7th Cir.1990). For Ms. Littlefield's state law claim, a JNOV can be granted only if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Cross v. American Country Ins. Co.,* 875 F.2d 625, 630 (7th Cir.1989), quoting *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967).

██ Mr. McGuffey asks for a JNOV on a number of grounds, only one of which has even the slightest merit. He claims that the $100,000 punitive damages award must be set aside because Ms. Littlefield failed to introduce evidence of his ability to pay those damages. The court agrees with Ms. Littlefield that it was Mr. McGuffey's burden to produce such evidence if he wanted it to be considered in mitigation. See, e.g., *Woods–Drake v. Lundy,* 667 F.2d 1198, 1203 n. 9 (5th Cir.1982); *Zarcone v. Perry,* 572 F.2d 52, 56–57 (2d Cir.1978); *Tri–Tron Int'l. v. Velto,* 525 F.2d 432, 438 (9th Cir.1975); *El–Ranco, Inc. v. First Nat'l. Bank of Nevada,* 406 F.2d 1205, 1218–19 (9th Cir.1968). Requiring Mr. McGuffey to bring forward evidence to show his inability to pay is in accord not only with federal caselaw, but with general principles of allocating burdens of proof and of producing evidence. The party who controls the evidence should have the burden of producing it. See generally, Edward W. Cleary, "Presuming and Pleading: An Essay in Juristic Immaturity, 12 *Stan. L.Rev.,* 5 (1959) and *McCormick on Evidence* § 317. Mr. McGuffey, who possesses whatever evidence (if any) exists to demonstrate his financial status, chose to remain silent. He must now live with that choice.

Mr. McGuffey argues that Ms. Littlefield had at her disposal discovery tools to uncover the evidence she needed to prove his ability to pay the punitive damages award. This claim is the height of disingenuity, as Ms. Littlefield demonstrates by chronicling Mr. McGuffey's flagrant and persistent abuse of discovery: Mr. McGuffey apparently lied about the number of buildings he owns; he claims to have no checking or savings account, despite receiving rental income; he lied about not having a social security number (he has at least two); and he made up the name of a bank where he allegedly had a mortgage. These facts demonstrate yet another reason why it would be inappropriate to follow Mr. McGuffey's state law cases on punitive damages rather than federal law: while Ms. Littlefield may have had discovery tools to gather evidence of Mr. McGuffey's financial status, *Dumas v. Stocker,* 213 Cal.App.3d 1262, 1267–69, 262 Cal.Rptr. 311, 314–16 (1989), Mr. McGuffey used every possible means to subvert Ms. Littlefield's legitimate discovery requests. The court will not permit Mr. McGuffey to seek shelter under the same principle that he has so flagrantly abused.

Ms. Littlefield put on what evidence Mr. McGuffey gave her regarding his financial status, namely, his ownership of three buildings. Contrary to Mr. McGuffey's argument, the jury could infer from this that he was no pauper. How much more they should have considered was Mr. McGuffey's responsibility.

██ With regard to the amount that was awarded, $100,000 was amply supported by the evidence in this case. As it turned out, Mr. McGuffey's rejection of Ms. Littlefield as a tenant on account of the race of her daughter and boyfriend was perhaps the least offensive act he committed. It appar-

ently was not enough for Mr. McGuffey to break the law by reneging on the agreement to rent the apartment for racial reasons, he also had to remove Ms. Littlefield's belongings, exposing them to theft and her to public humiliation when she came to retrieve them. And it was not enough for Mr. McGuffey to remove her as a tenant, he also had to call her for many days afterwards to harass her with racist abuse. Nor was it was enough for Mr. McGuffey merely to harass Ms. Littlefield, he had to broaden his attacks to include members of her family who did not live with her. And it was not even enough for Mr. McGuffey to spread his venom to Ms. Littlefield's family, he took it upon himself to actually seek out Ms. Littlefield's sister, go to her home, and physically intimidate her. Finally, not satisfied with subjecting Ms. Littlefield and her family to this extraordinary amount of abuse, harassment, and intimidation: over one month after Ms. Littlefield was kicked out, Mr. McGuffey still felt compelled to search out Ms. Littlefield's new address, go over to her home, and attach a note to her door threatening the life of her boyfriend. The extremely offensive and violent nature of Mr. McGuffey's threats—as well as the fact that all of this conduct was entirely gratuitous, Ms. Littlefield being completely out of his life as of September 27—provides more than enough support for the jury's punitive damages award. Mr. McGuffey should consider himself lucky that Ms. Littlefield showed restraint in only seeking $100,000.

### Sanctions

None of Mr. McGuffey's other claims has even the slightest merit. The argument by Mr. McGuffey's lawyers that their client is entitled to a JNOV on all three federal claims because there was no evidence of intentional discrimination "at the time" he rejected the lease application is particularly frivolous and violates Fed.R. Civ.P. 11. Rule 11 imposes on all parties an obligation to conduct a reasonable inquiry before submitting any "pleading, motion, or other paper" to the court. Two kinds of inquiry are contemplated. Before filing a paper, the attorney must certify that "to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact...." The inquiry must also establish that the paper "is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law...." In addition to a factual and legal inquiry, the attorney must certify that the paper is not being used to harass, delay or increase the costs of litigation. The test for a violation of the rule is objective. *Brown v. Federation of State Medical Boards of U.S.*, 830 F.2d 1429, 1435 (7th Cir.1987). Once the court decides that the rule has been violated, sanctions must be imposed. *Brown* at 1433. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1082 (7th Cir.1987).

A court may assess Rule 11 sanctions "on its own initiative." See Fed.R. Civ.P. 11 and *Shrock v. Altru Nurses Registry*, 810 F.2d 658, 662 (7th Cir.1987). The extraordinary frivolousness of defense counsel's argument on the issue of discriminatory intent makes this an appropriate case for the court to exercise that initiative. Even though this court has found the argument on punitive damages to be colorable, the Seventh Circuit has held that sanctions may be assessed both when the pleading as a whole is frivolous and when only parts of it are: "A litigant cannot expect to avoid all sanctions under Rule 11 merely because the pleading or motion under scrutiny was not *entirely* frivolous." *Melrose v. Shearson/American Express, Inc.*, 898 F.2d 1209, 1215 (7th Cir.1990). See also *Hill v. Norfolk and Western Railway Co.*, 814 F.2d 1192, 1200 (7th Cir.1987).

By claiming that their client is entitled to a JNOV because there was no evidence of intentional discrimination "at the time" Mr. McGuffey rejected Ms. Littlefield's lease application, Mr. McGuffey's lawyers ask this court to believe that a person's intent as to a particular act can only be inferred from things that occurred before that act. They cite no authority for this proposition, which is so contrary to common sense.

Many acts may be entirely neutral or unexplained when performed, and the actor's intent discoverable only by things he said, or did, afterwards. As Ms. Littlefield points out, it was not until September 27 that Mr. McGuffey even knew of a racial reason to discriminate against her. And yet Mr. McGuffey's lawyers say the following:

> In this case, moreover, there was no testimony whatsoever that Wally Mack engaged in any coercion, intimidation, threats, or interference aimed at preventing the plaintiff from exercising her right to live at 2955 North Spaulding, prior to September 27, 1988.

Motion for JNOV at 7.

> ... even though the court may consider the conduct of the defendant as alleged by the plaintiff, at worse harassing, it clearly does not rise to the level of coercion, intimidation, threatening or interference with the plaintiff's right to rent the apartment at 2955 North Spaulding.

*Id.* at 8. These are astonishing claims to make in the face of the facts recited at the beginning of this opinion regarding Mr. McGuffey's racist abuse and persistent attempts to intimidate Ms. Littlefield and her family.

Ms. Littlefield had the burden of showing that Mr. McGuffey intentionally discriminated against her, *Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir.1975); *Kaplan v. 442 Wellington Cooperative Building Corp.,* 567 F.Supp. 53, 56–57 (N.D.Ill.1983) (Parsons, J.), and threatened her, *Stackhouse v. DeSitter,* 620 F.Supp. 208, 210–11 (N.D.Ill.1985) (Aspen, J.). She has discharged her burden easily. So while it is true enough that there is no evidence of discriminatory intent prior to the rejection, this is a meaningless truth. By asking for a JNOV on the issue of discriminatory intent, Mr. McGuffey's lawyers were obligated to show that the evidence as a whole, with all inferences favoring Ms. Littlefield, did not support the jury's verdict. *Cygnar,* 865 F.2d at 834. As the evidence overwhelmingly demonstrates, they are not even close, and it is frivolous for them to suggest otherwise. Counsel have violated two prongs of Rule 11: their motion shows inadequate legal inquiry and it is being used "to harass, delay or increase the costs of litigation."

The Seventh Circuit has urged the lower courts to distinguish between attorney and client misconduct when assessing sanctions. *Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986). That is easily done here, where any competent attorney, after a reasonable inquiry, would know that he could not argue that existing law supports a JNOV in this case on the issue of discriminatory intent. Unfortunately, counsel apparently believe that vigorous advocacy means that a lawyer can say anything he wants, as long as it somehow supports his client. Their conduct throughout the case demonstrates this misconception, from their frivolous motion for summary judgment to their absurd argument at trial that Mr. McGuffey's claim to belong to the Ku Klux Klan has no relevance in a case about racial discrimination and harassment. Trial Transcript at 109, 112. Rule 11 places certain limits on what arguments can be advanced on behalf of a position, and Mr. McGuffey's lawyers are well outside those limits in asking for a JNOV.

▮▮▮ The sanction for such a violation should be more than nominal, and should approximate the time reasonably expended to respond to the sanctionable portion of Mr. McGuffey's motion. The court estimates this to be roughly five hours, multiplied by Mr. Schneck's rate of $100/hour to yield a sanction of $500. Since the sanctionable conduct was primarily related to frivolous legal argument, it should be borne by Mr. McGuffey's attorneys. *Thornton,* 787 F.2d at 1154. Since Ms. Littlefield's attorneys are already being compensated for their time under § 1988, the sanction should be paid to the clerk of the court.

As already noted, because the offending conduct is so extreme and clear from the

record, the court considers this an appropriate case to assess sanctions on its own initiative. However, the court is also aware that such a ruling, without giving Mr. McGuffey's attorneys an opportunity to respond, implicates considerations of due process. Accordingly, defense counsel will have until November 26, 1990 to address either the appropriateness of sanctions or the amount assessed.

### Motion for New Trial

The standard for deciding a motion for a new trial is whether the verdict is against the weight of the evidence, or unfair for some other reason. *Valbert v. Pass*, 866 F.2d 237, 239 (7th Cir.1989). As should be clear from the above discussion, the overwhelming weight of the evidence favored Ms. Littlefield. Moreover, the court adheres to its evidentiary and jury instruction rulings for the reasons stated on the record. The motion for a new trial is denied.

### Attorneys' Fees

■ The court grants Ms. Littlefield all of the attorneys' fees in her petition. Ms. Littlefield was a prevailing party on her federal claims and so is entitled to fees under *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). As to defense attorneys' objections to specific items, they are meritless. Ms. Littlefield's attorneys have amply documented all of their time, and the court finds that all of that time was reasonable and well spent. There was no duplication of effort or of attorneys. Mr. McGuffey's claim of a "revolving door" with Ms. Littlefield's attorneys is unpersuasive. When an attorney leaves a firm, as is not uncommon, someone from the firm must take over. Mr. Schneck took over this case and brought himself up to speed in a reasonable amount of time. As to the presence of more than one plaintiff's attorney at certain depositions and at trial, this is standard practice these days. It is a practice particularly appropriate here, where effi-

cient handling of numerous exhibits and the key role of prior deposition testimony for impeachment of a prevaricating witness, made the presence of extra members of Mr. Schneck's firm necessary. In any case, Mr. McGuffey's lawyers—both law firms' worth—are hardly in a position to complain about overstaffing.

As to claims of excessive time spent on things such as deposition review, file review, and the final pretrial order, those claims are baseless. Total mastery of Mr. McGuffey's very lengthy deposition was critical to conducting his adverse examination. Significant time was necessary to gain this control due to Mr. McGuffey's numerous lies, contradictions, and generally obstreperous conduct. The effectiveness of Mr. Schneck's adverse exam demonstrates that this time was well-spent. The same rationale underlies the time spent on file review, since Mr. McGuffey's many frivolous arguments before and during trial had to be answered by a tortuous retracing of the often intricate facts, many of which had occurred during discovery and were unknown to the court. Mr. Schneck's grasp of these facts was most helpful.

Also worthwhile was the time Ms. Littlefield's attorneys spent on all written work, especially the final pretrial order. This court has exacting demands of final pretrial orders, which are primarily the burden of the plaintiff to meet. Ms. Littlefield's attorneys met those demands, which required significant expenditure of time. They are entitled to be compensated for that time. The uniformly high quality of Ms. Littlefield's attorneys' written submissions and their preparation for all court proceedings easily justifies the entries on their petition.

■ The court does not consider a multiplier to be appropriate in this case. Multipliers are appropriate to account for the risk inherent in taking on certain civil rights cases. *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984); *Kirchoff v. Flynn*, 786 F.2d 320, 326 (7th Cir.

1986); *Skelton v. General Motors Corp.,* 860 F.2d 250, 254–58 (7th Cir.1988). However, the risk discussed in the cases is the risk of failure, and that risk just wasn't very large here. There were few novel legal issues, and the law and facts overwhelmingly favored Ms. Littlefield. It is true that Mr. McGuffey's extraordinarily obstreperous conduct made this a difficult case in that it took time to overcome Mr. McGuffey's stonewalling, machinations, and frivolous defenses. See, for example, the incident during Mr. McGuffey's deposition on July 21, 1989, when he threw a piece of evidence—a handwriting sample—into the garbage and spit tobacco juice on it, having earlier claimed that he had flushed it down the toilet. McGuffey Deposition at 482–83. However, this kind of difficulty is more a question of having the patience and endurance to bring out the facts that an attorney with a reliable client already knows are there.

Ms. Littlefield's attorneys had a respectable client who had been egregiously wronged. They also had many respectable witnesses to corroborate their client's position. They faced a thoroughly incredible defendant who, at least from the time of his deposition, was an easy target for cross-examination. Most trial lawyers only dream of getting the chance to cross-examine a witness like Patrick McGuffey: "Are you Osvaldo Kennardo?—I can be if I want to be, can't I?" Multipliers apply to risk, not difficulty, at least not in the sense that this case was difficult. The difficulty in this case stemmed entirely from the defendant's conduct which gave rise to the inordinate amount of time spent. Mr. McGuffey will now pay for every minute of that time. Since Ms. Littlefield's risk of losing was small, the court will not apply a multiplier.

The court awards attorneys' fees in the amount of $138,252.50 and costs of $9,676.98. Minus the $1,361.50 already paid, Mr. McGuffey is liable for attorneys' fees in the amount of $146,567.98. Mr. McGuffey's motions for JNOV and a new trial are denied. Judgment in the amount of $50,000 for compensatory damages and $100,000 in punitive damages will stand. Mr. McGuffey's attorneys will have until November 26, 1990 to address the issue of sanctions as discussed in this opinion. They also have until November 26 to respond to Ms. Littlefield's reply brief on attorneys' fees, where her attorneys petition for fees incurred in preparing the original petition.