In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1484

TROY BANISTER,

*Plaintiff-Appellant,*

*v.*

OFFICER CRAIG BURTON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-05759—**John W. Darrah**, *Judge.*

ARGUED DECEMBER 3, 2010—DECIDED FEBRUARY 14, 2011

Before FLAUM, ROVNER, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. Troy Banister sued Chicago police officers Craig Burton and Marc Moore along with the City of Chicago (we'll refer to all the defendants, collectively, as "the City") alleging deprivation of his civil rights under 42 U.S.C. § 1983. A jury returned a verdict in favor of the City. Banister now appeals the admission of the testimony of one of the City's main witnesses, the City's failure to file an expert witness

report under Federal Rule of Civil Procedure 26(a)(2)(B), and the admission of a remark made during closing arguments by counsel for the City.

The jury in this case heard two irreconcilable versions of what ultimately happened on a January night in Chicago in 2006. We start with the version presented by Mr. Banister.

Banister, who was in his mid-20s at the time, testified that on the night in question he was riding around in a gray van with his girlfriend, Melissa DeBerry, looking to buy "some weed." Melissa, who was driving, pulled up alongside a car and talked to its driver about buying marijuana. The driver of that car turned out to be Craig Burton who, unbeknownst to DeBarry or Banister, was a Chicago police officer working undercover in a drug operation. The cars moved off the road, then stopped, and Banister got into the passenger's side of Burton's car. There, they had a "very calm and normal conversation" with Banister saying he wanted to buy "weed" from Burton. A few moments later, both got out of the car, and Banister heard someone (probably Burton) say put your hands up and "drop the gun." Banister put his hands up, but he had no gun to drop. Burton then shot the unarmed Banister. It is undisputed that thirteen shots were fired (all the bullets that Burton had in his nine-millimeter semiautomatic pistol) and that Banister was hit some six times. Banister said he was about eight feet away when Burton shot him "for no reason at all." Most of the bullets apparently hit an arm, a leg, and Banister's buttocks.

Burton's story was quite different. He said his role in the undercover operation was to nail drug sellers and for that reason, when Banister got into his car and said "what are you looking for," he replied "rocks" meaning crack cocaine. But things went south when Banister saw Burton's money. At that point Banister pulled a gun, demanded money, and said, "Give it up punk-ass nigger." Burton said he gave Banister a $20 bill, but that wasn't enough. Thus, with Banister threatening him, he opened the center console of the car and in a panic (he said he feared for his life and did not want Banister to see his gun and conclude he was a cop) he "reached in frantically and just threw money at him and said: take the car." Banister replied, "I know you got more money," and Burton (in an effort to get out of the car) said he had more in the trunk. Both men then got out of their respective sides of the car. Banister was still pointing a gun at him when Burton pulled out his gun, said "police, drop it" and fired thirteen shots when Banister failed to comply. The shots were fired in around three to five seconds. Burton said he fired because he thought he was going to be killed.

Burton also testified that after being shot, Banister fell to his back and threw a gun over his shoulder. A gun was found forty feet from Banister. Banister, who maintains that he was unarmed, said the police planted the gun after shooting him as part of a frame-up. After being shot, paramedics transported Banister to Christ Hospital in Chicago, where Dr. Ross Fishman treated his gunshot wounds.

Subsequently, Banister was charged in state court with robbery for his role in the aborted drug transaction. He was acquitted by a jury. That could mean, of course, that the jury did not believe Burton's account of the incident. But one could speculate, alternatively, that it meant the jury believed Burton's version of the incident but concluded that getting shot six times was punishment enough for Banister. No one knows with 100% certainty why the state court jury did what it did. What we do know for certain is that after the acquittal, Banister filed this lawsuit in federal court against Burton and the City of Chicago. He added Moore as a defendant in his third amended complaint. And with that, we return to the issues raised on this appeal.

Pursuant to Rule 26(a)(2), the City disclosed its intention to call Dr. Fishman as a witness, indicating that he would:

> testify as to opinions, including but not limited to his opinion that [Banister] could have thrown the handgun with his right hand, and that, medically speaking, there was nothing that would prevent [him] from doing so . . . that [Banister] could have crawled after being shot, and that medically speaking, there was nothing that would prevent [him] from doing so.

Banister filed a motion in limine to bar Dr. Fishman from giving his testimony, arguing that the doctor is not an expert in biomechanics or throwing or crawling. During Dr. Fishman's testimony, the district judge held a sidebar to determine its admissibility. The judge overruled Banister's objections, responding:

> I don't think you need expertise in sports medicine to say whether someone was capable of throwing something. . . . It would seem to me a doctor could say whether or not the person he examined would have the ability to throw an object. And I don't think that requires any particular special expertise.

The judge also found that Dr. Fishman was qualified to testify that Banister "had the physical ability to crawl," and that no further expertise beyond his knowledge as a doctor was required.

Dr. Fishman testified:

> [a]lthough Mr. Banister suffered gunshot wounds to his right upper arm, shoulder area, diagnostic tests done, x-ray tests done and physical examination revealed no structural injury of significance. . . . So in my opinion the mere presence of the gunshot wounds and the damage they may have done to the muscles and to the skin and the fat underneath the skin would not have prevented him from throwing an object.

The doctor also testified that there was nothing in his opinion that would prevent Banister from being able to crawl after being shot.

After Dr. Fishman's testimony, the judge denied Banister's motion in limine on the record, finding that the testimony was admissible and that no written expert witness report (under Rule 26(a)(2)(B)) was required since Dr. Fishman was the treating physician. Accordingly, Dr. Fishman's testimony was heard by the jury in its entirety.

During closing arguments, counsel for the City stated: "Dr. Fishman testified that there was nothing with the plaintiff's injuries that would have prevented him from throwing that gun 40 feet." Banister immediately objected. The judge responded, "Ladies and gentlemen, you heard the testimony in this case. To the extent that what the lawyers say regarding the testimony does not comport with your recollection, you should disregard the statements." Counsel for the City then corrected his statement: "He testified that the injuries to him, to the plaintiff, would not prevent him from throwing an object."

The jury returned a verdict in favor of the City on all of Banister's claims. Banister filed a motion for a new trial citing the City's counsel's closing argument. The judge denied the motion for a new trial. Banister's estate now appeals.[1]

Banister first argues that Dr. Fishman did not have the requisite specialized knowledge to offer an opinion about his ability to throw a gun or crawl after he was shot. We review for abuse of discretion the judge's ruling on the admissibility of expert testimony. *Musser v. Gentiva Health Services*, 356 F.3d 751, 755 (7th Cir. 2004).

---

[1] On December 11, 2009, during post-trial proceedings, Banister was murdered during an unrelated incident in a yard on the south side of Chicago. Troy Banister, Sr. was appointed as the special administrator of the estate of Troy Banister to pursue this appeal.

The Federal Rules of Evidence define an "expert" as a person who possesses "specialized knowledge" due to his "skill, experience, training, or education" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that it is the district court's role to act as a gatekeeper before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *See also Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). When a district judge applies Rule 702 and *Daubert*, we will only reverse a ruling if it is "manifestly erroneous." *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997) (quotation marks and citation omitted).

Banister argues that the admission of Dr. Fishman's testimony was erroneous because he is not an expert in biomechanics or an orthopedic surgeon. In support, Banister cites several cases in which we found that a doctor's experience and training did not fulfill the criteria of Rule 702 and *Daubert*. *See Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993) (holding that the opinion testimony of a pathologist was properly excluded because a "pathologist, which is to say an expert on postmortems" is not an expert on the effects of electro-shock treatments on the human body and psyche); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (affirming the exclusion of a doctor's opinion on the grounds that it was a mere "hunch" and "lack[ed] scientific rigor").

But the City correctly explains that both cases are distinguishable. First, in both cases we affirmed the ruling of the district court, finding that it did not abuse its discretion. They were not cases in which we reversed a district court's ruling on an abuse of discretion standard. Second, in *Wilson*, the issue was whether a pathologist was qualified to testify as to the effects of electroshock therapy on the human body or psyche. The district judge found that the knowledge of an expert on postmortems is not the same as that of a neurologist, psychiatrist or physiologist; and we agreed. The facts here are different. Dr. Fishman, a trauma doctor, testified as to the physical abilities of Banister at the time he treated him. As the judge held, this type of knowledge is standard to all doctors, and Dr. Fishman was qualified to testify.

*Rosen* is equally distinguishable. There, the issue was whether a nicotine patch caused the plaintiff's heart attack. 78 F.3d at 319. Here, Dr. Fishman was not testifying as to causation, but rather to Banister's physical abilities at the time he was involved in the incident with the officers. He was neither offering a "hunch" nor presenting evidence that "lack[ed] scientific rigor." He was giving his opinion—the opinion of a trained trauma doctor who treated Banister—as to Banister's ability to move after being shot. The judge reasonably concluded that any "physician [who] studied anatomy" is qualified to answer such questions. We agree. Dr. Fishman was perfectly qualified, as both a trauma surgeon and the doctor who treated Banister, to testify as to Banister's ability to throw or crawl at the time of the treatment.

Finally, Banister argues, citing *Deimer v. Cincinnati Sub-Zero Products, Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (physician is not qualified to testify on matters beyond his "requisite experience"), *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 615 (7th Cir. 1993) (medical opinions cannot be admitted when a physician intends to give opinions unsupported by any method), and *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 674-75 (7th Cir. 2009) (physician may not present opinions simply because he is an "experienced physician"), that we have repeatedly rejected the "trained as a physician" argument to justify the admission of a doctor's opinions on matters that are beyond his (or her) "requisite experience." While Banister is correct regarding our precedent, he ignores the fact that Dr. Fishman is a trauma surgeon who testified as to the nature and severity of Banister's injuries at the time he treated him and then applied his knowledge of anatomy, gained through his experience as a trauma surgeon and as a student of medicine, to determine that the gunshot injuries would not have prevented Banister from using his arm to throw an object, or from crawling. Therefore, *Deimer*, *Porter*, and *Cunningham* are distinguishable. The judge did not abuse his discretion in allowing Dr. Fishman to testify about Banister's ability to throw or crawl after he was shot.

Banister next argues that the judge committed reversible error by allowing Dr. Fishman to testify because the City failed to file an expert witness report under Rule 26(a)(2)(B). The rule requires that a party must file a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one

whose duties as the party's employee regularly involve giving expert testimony." In *Musser*, we interpreted this rule to require that "*all* witnesses who are to give expert testimony under the Federal Rules of Evidence must be disclosed under Rule 26(a)(2)(A)" while "only those witnesses '*retained or specially employed to provide expert testimony*' must submit an expert report complying with Rule 26(a)(2)(B)." 356 F.3d at 756-57 (emphasis in original). Accordingly, the City argues that it was not required to file a report because Dr. Fishman was the treating physician and he was not retained by the City.

Banister argues that *Musser* should not end our inquiry because it does not resolve the question of whether a treating physician who testifies *beyond* the treatment of the patient or *beyond* the issues covered in ordinary medical training must file a report. *See Fielden v. CSX Transportation, Inc.*, 482 F.3d 866, 872 (6th Cir. 2007). And Banister is correct that in *Musser* we acknowledged that "there is some expert testimony in the nature of the treating physician's testimony that does not require a report," but that "some district courts have suggested that if the Rule 26(a)(2)(A) testimony exceeds the scope of treatment and ventures into more general expert opinion testimony, a report may be necessary." 356 F.3d at 758 n.3. Recently, we held that:

> a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one "retained or specially employed to provide

> expert testimony in the case," and thus is required to submit an expert report in accordance with Rule 26(a)(2).

*Meyers v. National Railroad Passenger Corp.*, 619 F.3d 729, 734-35 (7th Cir. 2010).

The City, however, correctly argues that *Meyers* is distinguishable from the facts of this case. First, *Meyers* applies to a physician's opinion as to the *cause* of an injury determined for the purpose of litigation, which is different from a physician's opinion as to the *effects* of the injury at the time of treatment. *Id.* Second, Dr. Fishman did not formulate his opinion at the request of the City as the doctors in *Meyers* had. Rather, he gave the same testimony at the state criminal trial and when he was deposed by the parties.

Moreover, even if the City was required to file a report for Dr. Fishman, a new trial is only required if the error was harmful. The judge found, and we agree, that the City's failure to file a report did not harm Banister. In *Westefer v. Snyder*, we explained that a district court:

> need not make explicit findings regarding a justification or the harmlessness of the Rule 26 violation, but . . . the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

422 F.3d 570, 585 n.21 (7th Cir. 2005) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). In this case, the judge was correct that even if a report was necessary, the failure to file one was clearly harmless because Banister wasn't surprised by the doctor's testimony—he heard it before in the state trial. Also, Banister provides no evidence that the failure to file the report was in bad faith. The City reasonably believed that Dr. Fishman was not covered by the rule: he was the treating physician and was not "retained or specially employed to provide testimony."

Lastly, Banister argues that he is entitled to a new trial because the City's counsel made improper comments during closing arguments. We disagree. We have "repeatedly explained that 'improper comments during closing argument rarely rise to the level of reversible error.'" *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989) (citations omitted). This is "particularly pertinent when the comment is merely a brief and unrepeated part of a lengthy argument." *Id*. Furthermore, "an instruction to the jury stating that the arguments of counsel are not evidence can mitigate the harm potentially caused by improper statements made by counsel during closing argument." *Id*.

In this case, the City's counsel obviously made a slip of the tongue when he said, "Dr. Fishman testified that there was nothing with the plaintiff's injuries that would have prevented him from throwing that gun 40 feet." The "40 feet" part of the comment was not in evidence. After Banister immediately objected, counsel

corrected his statement, and the judge immediately reminded the jury that "[t]o the extent that what the lawyers say regarding the testimony does not comport with your recollection, you should disregard the statements."

The facts here are readily distinguishable from the cases Banister cites in which we have ordered a new trial. Counsel did not take "improper advantage of the order he himself had procured forbidding the plaintiff's counsel to put before the jury the true financial consequences of a judgment." *Joseph v. Brierton*, 739 F.2d 1244, 1247 (7th Cir. 1984) (granting a new trial when the district judge's instructions were not enough to counter the serious misconduct). Counsel also did not tell the jury that Banister's "own lawyer doesn't believe his client. . . . He's not even convinced." *Spicer v. Rossetti*, 150 F.3d 642, 643 (7th Cir. 1998) (finding that the counsel's comments were "grossly inappropriate" and thus a new trial was warranted). While counsel's comment went a bit too far, it was cured both by his immediate correction and the judge's instructions to the jury.

For these reasons, the judgment of the district court is AFFIRMED.